# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-06-00355-CV**

---

**In the Matter of R. C., Appellant**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. J-17,565, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

In October 2000, appellant was adjudicated delinquent based on the underlying offense of attempted capital murder. Appellant was committed to the Texas Youth Commission (TYC) on a twenty-year determinate sentence. In January 2006, the TYC requested that R.C. be transferred to the Institutional Division of the Texas Department of Criminal Justice (TDCJ) to complete his determinate sentence. *See* Tex. Hum. Res. Code Ann. § 61.079(a) (West Supp. 2006). In April 2006, after a hearing, the court ordered appellant to be transferred to the TDCJ. *See* Tex. Fam. Code Ann. § 54.11 (West Supp. 2006). In one issue on appeal, appellant contends that the trial court abused its discretion in ordering this transfer. We affirm the trial court's order.

## Background

At the transfer hearing, numerous witnesses testified. Most of the witnesses were employees of TYC who had dealt with appellant in various capacities. Jacqueline Daiss, a therapist at the Giddings State School, testified as the TYC psychological examiner. She described

appellant's record with TYC. As of June 5, 2005, the date of the examination, appellant had accrued 58 documented incidents in the "Correctional Care System," including seven category one referrals, the most serious category. Among the problems documented were an "aggressive confrontation" with another student in November of 2005 and involvement in stealing letters and pornography from a "staff desk." Several incidents involved gang related activity. However, Dais characterized appellant's TYC record as revealing very few major incidents.

Samuel Adepipe, appellant's most recent caseworker, described TYC's methods of assessing a juvenile's progress. Each juvenile is assessed in three different areas: academics, behavior, and correctional theory. The correctional theory area is weighted more heavily than the other two areas in making an overall assessment of the juvenile's progress. Within each area, a rating of zero to four, with four being the best rating, is assigned. The juveniles need to meet certain goals to move from one rating to the next. Appellant achieved ratings of A-4 and B-4. He had earned his GED and high school diploma, as well as learning marketable skills in construction and cabinet making. However, appellant's correction theory rating had remained at C-2 for much of his time at TYC.[1] Adepipe testified that correction theory was important because it reflected a juvenile's attitude toward his crime. The principal reasons for appellant remaining at level two were his failure to take responsibility for his actions, tendency to blame others for his problems, and failure to express remorse or regret for his crime.

---

[1] Appellant was placed on phase level C-3 for five months in 2002. He was demoted to level C-2 because of behavior problems, ongoing problems in group therapy, being manipulative and deceptive, and involvement in gang-related activities. He failed to complete numerous assignments under his individual case plan, in spite of being warned that a demotion would occur.

A phase assessment hearing is held to assess a juvenile's progress and whether the juvenile can move from C-2 to C-3. Achieving a C-3 rating shows that the juvenile has moved from understanding how they were affected in their lives by their offense to the effect their actions had on others. A juvenile at level C-3 has recognized the patterns of behavior and thought that lead to committing crimes and victimizing other people and accepted responsibility for his actions.

Josh Ethridge, an associate psychologist at the Giddings State School, testified that he sat in on phase assessment reviews for appellant in October 2005 and January 2006. He described how important it was for the students to learn to have real empathy for their victims. Ethridge testified that although appellant made progress in this area and was able to talk about empathy, the members of the phase assessment review team did not feel that he was being genuine or honest in his feelings. Further, he had failed to accept responsibility for his actions, both in seeming to blame the victims of his crime and in blaming others for his referrals within TYC. The treatment team felt that he was being dishonest, manipulative and still viewed himself as the victim. Ethridge said that he thought that appellant attempted to "front" or fake remorse. This inability to display true empathy prevented appellant from achieving level C-3. Ethridge acknowledged that he knew of no studies that linked empathy and recidivism, however.

Appellant was at one time in a specialized group within TYC to treat capital offenders (COG). His case worker while in that group, Maxine Cooper, testified that appellant presented "a risk to the community." She based this assessment on his patterns of thinking, his manipulation, his being deceitful and sneaky, and his lack of empathy. She stated in her "Youth Behavior Summary" that he had "demonstrated the ability to maintain appropriate behavior when he makes the effort as

3

well as demonstrate[d] the ability to master excellent skills in manipulation and deception." She said that although he had many strong qualities and was a likable person, his inability to change his patterns of thinking would make him a threat to victimize people in the future. He was eventually removed from the COG program because of his inability to complete the "Crime Story" portion of the program. Specifically, he left out important information about the offense and failed to display "care and concern" for others.

Nicolas Ramos, appellant's instructor in the cabinet construction program, testified that he had taught appellant for two years and never had behavioral problems with appellant. Appellant spent several hours a day in his class. He said that appellant would be able to get a job without any difficulty because of the skills he had developed. Appellant would help new students learn the shop's rules and guidelines. However, Ramos never spoke to appellant about the crime or appellant's feelings about his past. Sometimes appellant would be depressed about the possibility of being transferred to TDC and Ramos would tell him to talk to his case worker. In general, he does not read a student's file unless he has a serious concern about that student, so he was not familiar with the details of appellant's crime or his disciplinary record within TYC. He would be comfortable working with appellant or having appellant live next door to him.

Brandon Griggs, a correction officer, had worked at Giddings for nine months at the time of the transfer hearing. Appellant was housed in Griggs's dorm. Griggs never had a behavioral problem with appellant. Appellant participated well in the behavior group that Griggs ran and helped out the other students. He said that appellant had expressed shame about his offense. Appellant told

4

Griggs that he wanted to get a job, have his own family and place to live, and build a soccer field for local kids. In his opinion, appellant was rehabilitated.

Leonard Cucolo, the TYC court liaison, presented the formal recommendation that appellant be transferred to TDCJ. He gave his opinion that appellant's case was a hard one that in many ways "boiled down to" subjective determinations of the staff that evaluated him. However, he also described the assault on another TYC juvenile which occurred six months before the transfer hearing, after appellant knew he was being evaluated for possible transfer to TDCJ and in a "high restrictions" environment. Cucolo considered this assault an indication that appellant was still using a lot of the same type of thinking and behavior that caused his crime even after five years of exposure to rehabilitative programs. There were no more intensive programs available to appellant than the ones that he had already tried. In any event, appellant would not be able to remain at TYC after age 21.

In addition to testimony about appellant's behavior while in TYC, there was testimony from various counselors concerning appellant's history before he attempted to commit capital murder. He had been referred to the juvenile system for aggravated assault for threatening his mother with a knife; assault with injury for hitting his brother with a stick; arson; truancy; and making a false report. He had assaulted teachers and peers, made terroristic threats, possessed weapons, and called in a bomb threat to his school when he was 13. In a psychological report that was in evidence, he said that he had been fascinated with knives from an early age and had stabbed one gang member. When asked about the stabbing, he stated that he "liked to get people back" and said that he intended to hurt or kill the gang member. Daiss testified that appellant

had told her about conduct that went outside the official records. Most of the behavior involved gang-related activities such as burglaries, destruction of property, and transporting cocaine and marihuana for the gang. He also said that he had been "jumped into" a gang called Murder Cide Crips at age 11. However, she and other of appellant's therapists were suspicious that he was overstating his gang history.

Appellant was described as having been diagnosed with "conduct disorder, adolescent type, severe."[2] Such a diagnosis indicates a risk for future criminal behavior.

The targets of the crime underlying appellant's adjudication as delinquent were the parents of appellant's girlfriend and had forbidden her to see him anymore. Appellant, who was fourteen at the time, entered their home while they were asleep. He was dressed entirely in black, with a bandanna and pantyhose hiding his face. He had taped his shoes to minimize footprints. He carried two knives taped to his legs. The mother awakened first and alerted the father that someone was at the door. He confronted appellant and, in the altercation that followed, appellant stabbed both the father and mother. Eventually, the couple was able to restrain appellant and call the police.

At the hearing, the parents testified that they would be so frightened if appellant were released that they would obtain concealed handgun licenses. The father testified that he sustained six knife wounds from the attack. At the time of this hearing, he still experienced problems affecting the use of his right arm because of the knife wounds. The mother testified that she can no longer sleep without lights on, gets up two or three time a night to check on the family, no longer

---

[2] One psychological report classified it as "childhood onset," making the disorder even more severe.

goes out at night, and sleeps facing the door. She said that they had to move out of their previous home and change jobs.

Marcus Ramirez, the program director for the super intensive parole supervision program for the State of Texas, described the security features of the program. However, he said that only about one in ten offenders referred to the program is actually placed in the program. The court had no power to place the juvenile in the program; the parole board has that power.

Appellant's mother did not testify, but was allowed to speak. She expressed sympathy to the victims and said that her son had learned that what he did was wrong while in TYC and had expressed regrets for his crime. She did not consider him a threat to the victims.

**Discussion**

*Standard of Review*

A juvenile committed to TYC under the family code may be referred to the juvenile court for approval of the transfer of the child to TDCJ if the juvenile is between the ages of sixteen and twenty-one, the juvenile has not completed his sentence, and the juvenile's conduct indicates that the welfare of the community requires the transfer. Tex. Hum. Res. Code Ann. § 61.079. The standard of review for a transfer decision is abuse of discretion. *In re J.L.C.*, 160 S.W.3d 312, 313 (Tex. App.—Dallas 2005, no pet.); *In re C.L.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ). The reviewing court analyzes the district court's decision to see if it was made without reference to guiding or principles. *J.L.C.*, 160 S.W.3d at 313; *C.L.*, 874 S.W.2d at 886. A transfer will only be reversed if the court acted in an unreasonable and arbitrary manner. *J.L.C.*, 160 S.W.3d at 313.

The trial court may consider the following factors when evaluating the transfer:

(1)     the experiences and character of the person before and after the commitment to the youth commission;

(2)     the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed;

(3)     the abilities of the person to contribute to society;

(4)     the protection of the victim of the offense or any member of the victim's family;

(5)     the recommendations of the youth commission and the prosecuting attorney;

(6)     the best interests of the person; and

(7)     any other factor relevant to the issue to be decided.

Tex. Fam. Code Ann. § 54.11(k).  The trial court need not consider all of the listed factors and may assign different weights to the factors it considers.  *J.L.C.*, 160 S.W.3d at 313-14; *C.L.*, 874 S.W.2d at 886.

### *Application*

Appellant had an extensive history of offenses before his commitment to TYC. Further, most of those offenses were of a violent nature: assaults against family members and others, arson, and terroristic threats.  He had also been diagnosed with early onset conduct disorder, a risk factor for re-offending.  The second factor, the offense committed and the manner in which the offense was committed, weighs heavily against appellant.  At fourteen, with the only provocation

8

being the disapproval of his relationship with their daughter, he committed a brutal and carefully calculated offense against the parents.[3]

Weighing in appellant's favor, he has developed technical skills that would allow him to contribute to society. He completed his high school education and secured marketable skills that would allow him to be self-supporting. However, as detailed in the testimony at the transfer hearing, the professionals working with him did not think that he had developed certain very fundamental attitudes and values that would allow him to use these skills and function in society. He had not shown empathy for his victims, was prone to blame others for his problems, and continued to use violence, as demonstrated by his attempted assault on another juvenile while aware that he was being evaluated for possible transfer to prison.

Although appellant has made no threats toward the victims, they feel endangered should he be released. Appellant's caseworkers testified that appellant continues to see himself as the victim of the father's "persecution" in harboring an unfounded dislike of appellant that resulted in the severing of appellant's relationship with the daughter. Such a thought process is part of the overall concern that appellant still thought in the same way that lead to his commitment in the first place.

The caseworkers and psychologists who had worked with appellant recommended transfer. The core concern about appellant was his failure to show empathy toward his victims and failure to take responsibility for his actions. Although one corrections officer said that he had heard

---

[3] From some of the TYC reports dealing with the underlying offense, it appears that appellant's girlfriend asked appellant to kill her parents. In some reports, appellant disclosed that he had planned to kill her as well.

appellant express shame for what he did, that evidence was contradicted by the various caseworkers who did not think that appellant felt empathy or remorse. One psychologist, Josh Ethridge, testified that he thought that appellant attempted to "front" or fake his remorse. He was removed from the COG program because he failed to accurately describe his crime.

Appellant argues that he had done well in his academic and vocational educational endeavors, and that his B-4 (highest level) behavior rating indicates that his behavior had improved at TYC. Appellant did not have the large number of referrals that some other juveniles did. However, he did have seven category one referrals, including the attempted assault.

With regard to the person's best interest factor, the State notes that it is "difficult to argue that a person is best served by limiting his freedom." The State notes his pre-TYC behavior was marked by a string of crimes, truancy, and misbehavior. In the structured environment of TYC however, he had been able to accomplish various goals. Appellant uses the same evidence of progress to argue for parole.

The focus of the evaluation was that appellant continued to display the same thought processes, in particular lack of empathy and failure to take responsibility for his actions, that resulted in his TYC placement. Without such changes, the staff evaluation was that transfer to TDCJ was the most appropriate placement. Appellant's counsel at trial vigorously cross-examined the various TYC caseworkers about their lack of contact with Ramos and Griggs, who spent more time with appellant than the caseworkers and who had a more favorable opinion of appellant than those caseworkers in an attempt to show that these various reports were deficient and to plead for parole.

The court engaged in a thorough analysis of the evidence. The court spoke at length to appellant. She told him that there were two fundamental reasons to send him to the TYC: rehabilitation and punishment. She told him that many times she had opposed the TYC's recommendation. She said that she did not think that he had been able to connect with Adedipe as a caseworker, and she was not sure she blamed appellant for that. She noted that Ramos, the shop teacher, a person with whom he connected, "drew a line" about how engaged he would become with the psychological aspects of his students. But, she also told appellant that he had not done "the hard work" of confronting and dealing with what he had done, not "put[] up walls" to block what he had done, saying: "And whether you do that at TYC, or on your own, or at TDCJ, you have to let yourself feel, live, and breathe, and quit trying to build a wall around yourself to act like it didn't happen; because it did. And it is that problem that I have that prevents me from granting your request."

She observed that the only time appellant made eye contact with her was when the father said that he forgave appellant and appellant had a look of shock on his face. She noted that she had not heard anything from appellant about wanting to do something to "make it up" to the victim. The court noted that "even those who believe in you the most," did not think that he had ever internalized what he did. The court concluded: "I do this because you committed a heinous crime, and you have not confronted it. And I don't know if society is safe, and you have some more time to pay."

11

## Conclusion

There was extensive testimony about appellant's performance in TYC. The court's statements at the close of the hearing made it clear that she had considered factors in appellant's favor as well as factors working against him. Based on this record, we cannot say that the court's decision was made without reference to guiding rules or principles or that the court acted in an unreasonable and arbitrary manner. *See J.L.C.*, 160 S.W.3d at 313. Accordingly, we affirm the trial court's order.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Puryear and Henson

Affirmed

Filed:   August 23, 2007

12